UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JASNA OSTOJICH and<br>JOHN OSTOJICH, individually and<br>on behalf of a class,<br><br>        Plaintiffs,<br><br>  v.<br><br>SPECIALIZED LOAN SERVICING, LLC,<br><br>        Defendant. | Case No. 21-cv-4852<br><br>Hon. Steven C. Seeger |

## ORDER

Plaintiffs Jasna and John Ostojich received a startling letter from a debt collector one day. The letter raised the fact that one of them had died, and it requested information about the possible formation of an estate. News of their passing was news to the Ostojichs, who were very much alive. As it turns out, reports of their death were greatly exaggerated.

The Ostojichs felt distraught by news of their death, so they filed suit against the debt collector, Defendant Specialized Loan Servicing, LLC. They advanced four claims under the Fair Debt Collection Practices Act and under Illinois law. The debt collector, in turn, moved to dismiss one of the federal claims and both of the state claims.

For the reasons stated below, the motion to dismiss is granted.

## Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast

the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

In 2006, Plaintiffs Jasna and John Ostojich took out a home equity line of credit with Bank of America. *See* Am. Cplt., at ¶¶ 6–7 (Dckt. No. 23); *see also* Pls.' Resp., at 1 (Dckt. No. 31). They secured the loan with a mortgage on their home in Park Ridge, Illinois. *See* Am. Cplt., at ¶¶ 7–8. The Ostojichs later defaulted on the loan. *Id.* at ¶ 8. After the default, Defendant Specialized Loan Servicing, LLC ("SLS") began servicing the loan. *Id.* at ¶ 9.

SLS attempted to collect the amount due. It mailed the Ostojichs collection letters and threatened bad consequences if they didn't pay up. *Id.* at ¶ 10. Then, in September 2020, SLS mailed the Ostojichs the letter at the center of this lawsuit.

SLS sent a letter about the supposed death of the (unspecified) owner of the mortgage loan. "Specialized Loan Servicing LLC has recently been informed that the owner of the above referenced property is now deceased. We would like to express our condolences over this loss." *Id.* at ¶ 13. SLS was sorry that someone was "deceased," but it didn't say who the decedent was.

The fact that the debt collector sent the letter at all was a bit curious. After all, debt collectors typically don't send Hallmark cards. It's pretty unusual to see a bouquet of flowers at a funeral parlor from a debt collector. Presumably the debt collector had some other objective in mind, other than expressing sympathy for the loss.

In the next breath, SLS asked for information. The letter identified SLS as the servicer of the mortgage loan, and explained that it needed information about the estate. *Id.* at ¶ 14; *see also* 9/11/20 Letter (Dckt. No. 23, at 19 of 20) ("For informational purposes, Specialized Loan Servicing LLC is the third party mortgage loan servicer who services the mortgage loan secured by this property. It is necessary that the representative of the borrower's estate provide

Specialized Loan Servicing LLC appropriate documents related to the estate."). The letter requested a copy of the death certificate, legal documentation naming the executor of the estate, and proof of property ownership. *See* 9/11/20 Letter.

The letter also included the so-called mini-*Miranda* warning under the Fair Debt Collection Practices Act, as well as a standard bankruptcy disclaimer. *See* Am. Cplt., at ¶ 15 (Dckt. No. 23); 9/11/20 Letter (Dckt. No. 23, at 19 of 20). Basically, the letter identified SLS as a debt collector, and then added a gloss on the letter just in case the debtors were in bankruptcy.

Specifically, the mini-*Miranda* warning highlighted that SLS is a debt collector. "[SLS] IS REQUIRED BY FEDERAL LAW TO ADVISE YOU THAT THIS COMMUNICATION IS FROM A DEBT COLLECTOR." *See* 9/11/20 Letter (Dckt. No. 23, at 19 of 20). The bankruptcy disclaimer explained that it wasn't demanding payment if they were in bankruptcy. "IF YOU ARE A CUSTOMER IN BANKRUPTCY OR A CUSTOMER WHO HAS RECEIVED A BANKRUPTCY DISCHARGE OF THIS DEBT," then the notice was "NEITHER A DEMAND FOR PAYMENT NOR A NOTICE OF PERSONAL LIABILITY." *Id.*

The letter came as quite the surprise to the Ostojichs, both of whom are alive. It came as a shock, and it hit a nerve. Jasna is, unfortunately, battling cancer and was receiving treatment when she received the letter. *See* Am. Cplt., at ¶ 19 (Dckt. No. 19). According to her declaration, the debt collector knew about her health challenges. *See* J. Ostojich Dec., at ¶ 6 (Dckt. No. 31-1, at 5 of 7).

The Ostojichs believed that SLS knew that they were alive, and sent the letter to try and coax them to communicate with SLS. *Id.* at ¶¶ 27–28. They also read the letter as a demand for payment. In particular, the Ostojichs read the bankruptcy disclaimer as a round-about way of

demanding payment. The bankruptcy disclaimer said that the letter wasn't a demand for payment if they were in bankruptcy. So, as the Ostojichs read it, the opposite was true: the letter *was* a demand for payment if they *weren't* in bankruptcy. *Id.* at ¶¶ 15, 18.

The complaint alleges that the letter caused the Ostojichs to suffer emotional and physical harm. *Id.* at ¶¶ 29–30. Jasna cried in fits, lost sleep, suffered from nausea, and felt malaise. *Id.* at ¶ 29. John also suffered severe emotional distress, as reflected by the loss of sleep. *Id.* at ¶ 30.

After receiving the letter, Jasna Ostojich called and talked to SLS multiple times to discuss the amount owed and the amount that SLS was attempting to collect. *Id.* at ¶¶ 37–38. She disputed the amount of the debt. *Id.* at ¶ 44. Despite disputing the amount, SLS did not report the debt as disputed with consumer reporting agencies such as Experian, Equifax, or TransUnion. *Id.* at ¶ 45. And by failing to report the debt as disputed, the Ostojichs received lower credit scores and had a harder time obtaining credit. *Id.* at ¶ 54.

The Ostojichs ultimately filed suit, and later filed an amended complaint with four counts. *See* Cplt. (Dckt. No. 1); Am. Cplt. (Dckt. No. 23). Count I alleges that SLS violated the FDCPA by sending the September 2020 letter. Count II is a class claim alleging that SLS violated the FDCPA by failing to report that the debt was disputed. Counts III and IV are claims under Illinois law.

SLS moved to dismiss Counts I, III, and IV. *See* Def.'s Mtn. to Dismiss (Dckt. No. 24). In response to the motion to dismiss, the Ostojichs agreed to dismiss the two state law claims. *See* Pls.' Rep., at 16 (Dckt. No. 31). Counts III and IV are dismissed.

The only remaining issue is Defendant's motion to dismiss Count I, meaning the FDCPA claim about the letter from September 2020.

**Legal Standard**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

When reviewing a motion to dismiss under Rule 12(b)(6), the court may consider "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Plaintiffs attached the letter from SLS to the amended complaint, so it's fair game on the motion to dismiss.

**Analysis**

Congress enacted the FDCPA "to eliminate the use of abusive debt collection practices against vulnerable debtors." *See Johnson v. Enhanced Recovery Co.*, 961 F.3d 975, 978 (7th Cir. 2020); *see also* 15 U.S.C. § 1692(e). The FDCPA "generally prohibits 'debt collectors' from engaging in abusive, deceptive, or unfair debt-collection practices." *See Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 384 (7th Cir. 2010) (quoting 15 U.S.C. § 1692 *et seq.*).

5

Communications between debt collectors and debtors are a prime target of the FDCPA. The Act regulates what debt collectors can say, and when, and how, and to whom. Long gone are the days when debt collectors could harangue, threaten, or deceive debtors for days on end, or say whatever it takes to get a debtor to fork over payment.

As a general matter, the FDCPA prohibits the use of harassing, oppressive, or abusive tactics to collect a debt. *See* 15 U.S.C. § 1692d. It bans false, deceptive, or misleading representations. *See* 15 U.S.C. § 1692e. And it bars unfair or unconscionable means to collect or attempt to collect a debt. *See* 15 U.S.C. § 1692f.

To bring a claim under the FDCPA, a plaintiff must clear two preliminary hurdles. *See Gburek*, 614 F.3d at 384. First, the defendant must qualify as a "debt collector." *Id.* That requirement is not at issue here. And second, the debt collector must have communicated "in connection with the collection of any debt." *Id.*

That phrase makes an appearance in several of the provisions. A debt collector cannot abuse or mistreat a debtor "in connection with the collection of a debt," and cannot make misrepresentations "in connection with the collection of any debt." *See* 15 U.S.C. §§ 1692d, 1692e; *see also* 15 U.S.C. § 1692c (restricting when and how a debt collector can "communicate with a consumer in connection with the collection of any debt").

A companion provision uses a slightly different phrase, but it is in the same neighborhood, if not right next door. A debt collector cannot use an unfair or unconscionable "means to collect or attempt to collect any debt." *See* 15 U.S.C. § 1692f. That's similar to the language from the preceding provision, which prohibits a debt collector from using a false, deceptive, or misleading "representation or means in connection with the collection of any debt." *See* 15 U.S.C. § 1692e. Using an unlawful "means to collect or attempt to collect any debt"

closely resembles using an improper "means in connection with the collection of any debt." *See* 15 U.S.C. § 1692f; 15 U.S.C. § 1692e.

On its face, the text of the statute uses sweeping language, covering a lot of ground with the inclusive phrase "in connection with." In common parlance, that phrase typically means "about" or "related to," or something along those lines. The plain language requires a link – X must be connected to Y.

Read naturally, the phrase "in connection with the collection of any debt" would seem to cover just about any communication between a debt collector and a debtor. After all, it seems vanishingly unlikely that a debt collector and a debtor would communicate about anything else.

Courts have recognized that the "statute does not apply to *every* communication between a debt collector and a debtor." *Gburek*, 614 F.3d at 384–85 (emphasis in original). That's true, as far as it goes. But then again, it's hard to see what else a debt collector and a debtor could be talking about, other than the collection of a debt. After all, that's the whole point of the relationship. They don't have much else to talk about.

Sure, a communication about the Chicago Bears, or the weather, or the breaking news of the day wouldn't be covered. But they probably aren't hot topics when debt collectors reach out to debtors. Debt collectors communicate about collecting debt. That's their job, and that's why they exist. They are unlikely to be pen pals with debtors about other topics.

That said, the statutory language of the FDCPA may not be as broad as it might appear at first blush. The operative phrase is not "in connection with a debt." It is "in connection with the *collection* of any debt." The placement of that noun hints at a possible limitation. The communication must be about collecting a debt. That is, the communication at issue must be an effort to collect something from the debtor.

7

Taking a step back, the very existence of that phrase in the statutory text suggests that there must be *some* limitation. The Act applies to communications between debt collectors and debtors "in connection with the collection of a debt." By injecting that language, Congress suggested that a limiting principle must be out there. Otherwise, that phrase would do no work, and there would be no point in including that language at all. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) ("If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").

The phrase "in connection with" is not a stranger in the United States Code. It is a key pillar of securities law, for example. The Exchange Act and Rule 10b-5 prohibit fraud "in connection with" the purchase or sale of a security. *See* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. In the securities context, courts have recognized the breadth of that language with full-throated enthusiasm, adopting a broad, inclusive reading. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("Moreover, when this Court *has* sought to give meaning to the phrase ['in connection with'] in the context of § 10(b) and Rule 10b–5, it has espoused a broad interpretation.") (emphasis in original); *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 392 (2014) ("In *Bankers Life*, we said that, if a deceptive practice 'touch[es]' a securities transaction, it meets § 10(b)'s 'in connection with' requirement, and in *O'Hagan*, we said the fraud and the purchase or sale of a security simply must 'coincide.'"); *SEC v. Zandford*, 535 U.S. 813, 819 (2002).

Another example is the use of "in connection with" in the Securities Litigation Uniform Standards Act of 1998. *See* 15 U.S.C. § 78bb(f)(1)(A). There, again, the Supreme Court

8

recognized that "Congress envisioned a broad construction" when using that phrase. *See Merrill Lynch*, 547 U.S. at 86; *see also Troice*, 571 U.S. at 397–98 (Thomas, J., concurring) ("We have said that the statutory phrase 'in connection with' warrants a 'broad interpretation' . . . .") (citation omitted).

And the phrase is not isolated to the securities realm. The phrase is found in criminal statutes and in the Sentencing Guidelines, too. For example, the Supreme Court recently addressed whether "imprison[ment] in connection with a conviction for Federal, State, or local crime" included pretrial detention later credited for a separate conviction. *See* 18 U.S.C. § 3624(e); *see also Mont v. United States*, 139 S. Ct. 1826, 1829, 1832 (2019). In deciding that pretrial detention fell within the meaning of the statute, the Supreme Court noted that it "has often recognized that 'in connection with' can bear a 'broad interpretation.'" *Mont*, 139 S. Ct. at 1832 (quoting *Merrill Lynch*, 547 U.S. at 85). The phrase also appears in the Sentencing Guidelines, where the Seventh Circuit noted that it "should be construed expansively." *See United States v. Wyatt*, 102 F.3d 241, 247 (7th Cir. 1996). The Court of Appeals came to that conclusion by drawing a comparison to the phrase "in relation to," which the Supreme Court has called "expansive" and "broad" in the criminal law context. *Id.*; *see Smith v. United States*, 508 U.S. 223, 237 (1993) (collecting cases).

The interpretation of "in connection with" is broad, but not limitless. When it comes to securities, the phrase "in connection with" the purchase or sale of securities is not so broad that it reaches any "common-law fraud that happens to involve securities." *See Zandford*, 535 U.S. at 820; *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982) ("Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud."). Words, even broad words, have necessary limits.

9

In other statutory contexts, courts have searched for a limiting principle to restrain the scope of "in connection with," so that it doesn't encompass anything and everything. "The phrase 'in connection with' is essentially 'indeterminat[e]' because connections, like relations, 'stop nowhere.' So the phrase 'in connection with' provides little guidance without a limiting principle consistent with the structure of the statute and its other provisions." *See Maracich v. Spears*, 570 U.S. 48, 59 (2013) (citation omitted); *see also N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for '[r]eally, universally, relations stop nowhere,' . . . . But that, of course, would be to read Congress's words of limitation as mere sham . . . .") (modification in original, citation omitted); *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) ("But applying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else.").

Turning back to the FDCPA, some courts have recognized the breadth of the statutory language and adopted a reading consistent with its inclusive sweep. A district court in the Southern District of New York read "in connection with" to mean "about" or "relating to" the collection of debt. *See Tocco v. Real Time Resols., Inc.*, 48 F. Supp. 3d 535, 540 (S.D.N.Y. 2014) ("'In connection with' is synonymous with the phrases 'related to,' 'associated with,' and 'with respect to.' It is expansive. It covers 'communications that convey, directly or indirectly, any information relating to a debt.'") (citations omitted).

The court in *Tocco* rejected a distinction between communications that give or seek information and communications that induce payment. "The fact that a letter may have been a

10

required informational notice under a separate statute does not prevent it from being an initial communication 'in connection with the collection of [a] debt' under the FDCPA." *Id.*; *see also Hart v. FCI Lender Servs., Inc.*, 797 F.3d 219, 226 (2d Cir. 2015) (noting the issue, but declining to reach it).

Most other courts don't go that far and read the language so broadly. Several Circuits have decided that a communication falls within the statute if it induces payment by the debtor. The Third, Sixth, and Eighth Circuits have held that "for a communication to be in connection with the collection of a debt, an animating purpose of the communication must be to induce payment by the debtor." *See McIvor v. Credit Control Servs., Inc.*, 773 F.3d 909, 914 (8th Cir. 2014) (quoting *Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 266–67 (3d Cir. 2013)); *Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011). In the Sixth Circuit, a communication "need not itself be a collection attempt; it need only be 'connect[ed]' with one," meaning that it must be "part of a strategy to make payment more likely." *See Grden*, 643 F.3d at 173 (alteration in original); *see generally Hudson v. Medicredit, Inc.*, 2018 WL 1378643, at *2–4 (E.D. Mo. 2018) (summarizing the case law).

The Seventh Circuit has drawn a similar line. But the line is not so bright. "Neither this circuit nor any other has established a bright-line rule for determining whether a communication from a debt collector was made in connection with the collection of any debt." *Gburek*, 614 F.3d at 384.

"Whether a communication was sent 'in connection with the collection of any debt' is an objective question of fact." *See Schlaf v. Safeguard Prop. LLC*, 899 F.3d 459, 464 (7th Cir. 2018); *see also Ruth v. Triumph P'ship*, 577 F.3d 790, 798 (7th Cir. 2009) ("[W]hether a communication was sent 'in connection with' an attempt to collect a debt is a question of

11

objective fact, to be proven like any other fact."). The answer does not depend on the subjective intentions of the debt collector, or on the subjective understanding of the debtor.

Courts in this Circuit and elsewhere have drawn a line between a communication that induces a payment and a communication that requests or provides information. A number of courts have concluded that a communication that merely seeks or gives information is not "in connection with the collection of a debt." *See Cardona v. FCI Lender Serv., Inc.*, 2017 WL 3531492, at *3 (N.D. Ill. 2017) ("The only reasonable interpretation of the letter, even to an unsophisticated consumer, is that it was intended for informational purposes only, and not an attempt to collect a debt . . . ."); *Buckley v. Bass & Assoc., P.C.*, 2000 WL 1006568, at *2 (N.D. Ill. 2000) ("Certainly a letter that simply requests bankruptcy information is not the type of letter that can be reasonably placed in the category describing a 'communication in connection with the collection of a debt' under the ambit of the FDCPA."); *McCready v. Jacobsen*, 2007 WL 1224616, at *1 (7th Cir. 2007) (holding that a letter that provided information, by summarizing how a security deposit applied toward unpaid rent and repairs, was not in connection with the collection of a debt).[1]

For example, in *Bailey*, the Seventh Circuit concluded that a letter did not fall within the statute because it merely listed the next four payments and forewarned the debtor about the

---

[1] This Court is not so sure about drawing a dividing line between communications that provide or request information (on the one hand) and communications that seek to collect debt (on the other). They seem like overlapping circles, at least in part. It is certainly possible that a debt collector could provide information to a debtor, or request information from a debtor, without attempting to collect a debt. Imagine, for example, a letter that simply updates a mailing address. But that's different than saying that providing or requesting information is *necessarily* a communication that is not in connection with the collection of a debt. One can dream up all kinds of scenarios when providing or requesting information would be part of an effort to collect a debt. Imagine, for example, a letter from a debt collector that asked for the name of the debtor's boss, or asked for the debtor's bank account information. Or, imagine a letter that revealed that the debtor's house was going to be sold next week (when, in fact, no such sale was going to happen).

consequences of non-payment. *See Bailey v. Sec. Nat'l Serv. Corp.*, 154 F.3d 384, 386 (7th Cir. 1998). "The important letter dated January 4 does not 'demand' any payment whatsoever, but merely informs the [debtors] about 'the current status' of their account. The due dates listed in the letter are all prospective. Surely this is not the type of dunning letter that describes a communication related to 'the collection' of a debt." *Id.* at 388–89.

The Seventh Circuit has offered a non-exhaustive list of factors that come into play when deciding whether a communication is in connection with the collection of a debt. One factor is whether the debt collector explicitly demanded payment. *See Gburek*, 614 F.3d at 384–85. That factor is suggestive, but it does not dictate whether the statute applies. A communication "need not make an explicit demand for payment in order to fall within the FDCPA's scope." *Id.* at 384; *see also Horkey v. J.V.D.B. & Assoc.*, 333 F.3d 769 (7th Cir. 2003).

Another factor is the "nature of the parties' relationship." *See Gburek*, 614 F.3d at 385. That factor stretches beyond the fact that the parties are a debt collector and a debtor. Otherwise, the factor wouldn't seem to add much value. Instead, this factor considers the parties and their course of dealing. In *Gburek*, for example, the existence of a "preexisting forbearance agreement" shed light on the communications in question. *Id.*

An additional factor is the "purpose and context of the communications – viewed objectively." *Id.* An example is whether a communication (like a privacy notice) appeared with another communication (like a collection letter). *Id.* The focal point appears to be the purpose of the particular communication at issue, not the purpose of communicating writ large.

Those factors provide a framework and guide the analysis, but they do not appear to set categorical boundaries. Courts can employ "commonsense." *Id.* at 385; *see also Carlvin v. Ditech Fin. LLC*, 237 F. Supp. 3d 753, 762 (N.D. Ill. 2017) (St. Eve., J.) (reaching a "common-

sense conclusion" based on the facts of the case); *Buckley*, 2000 WL 1006568, at *2 (relying on "common sense"). It depends on the "salient facts" unique to each case. *See Gburek*, 614 F.3d at 382.

The key inquiry is to look at the realities of the situation and determine if the specific communication at issue was inducing payment from the debtor. *See Gburek*, 614 F.3d at 382 (concluding that the "text of the letters indicate that they were sent to *induce* her to settle her mortgage-loan debt") (emphasis added); *id.* at 385 ("[A] communication made specifically to *induce* the debtor to settle her debt will be sufficient to trigger the protections of the FDCPA.") (emphasis added); *id.* at 386 (concluding that the communications were "made to *induce* the debtor to settle a debt") (emphasis added).

The Seventh Circuit in *Gburek* applied those factors and concluded that the communications at issue were in connection with the collection of a debt. The first letter invited the debtor to discuss "foreclosure alternatives" and requested financial information. That letter fell within the statute, even though it did not ask for payment, because it was an "attempt to collect Gburek's defaulted home loan – by settlement or otherwise." *Id.* at 386. An "offer to discuss Gburek's repayment options" was an attempt to collect a debt.

The same conclusion applied to the second letter. That letter encouraged the debtor to make contact to discuss debt-settlement options. *Id.* It was a communication "made to induce the debtor to settle a debt," so it fell within the statute. *Id.*[2]

---

[2] *Gburek* involved a third communication, too. Basically, the debt servicer (Litton) hired a third party (Titanium) to contact the debtor. The first letter was from the debt servicer to the debtor, and the second letter was from the third party to the debtor. The Seventh Circuit held that communications between Litton and Titanium fell within the statute too. *See Gburek*, 614 F.3d at 386. The statute applied to communications between the debt servicer and the third party when they arranged for the third party to contact the debtor.

14

Applying the *Gburek* factors to the letter at issue here, this Court concludes that the amended complaint does not plausibly allege that the debt collector sent the letter in connection with the collection of a debt.

Starting with the first factor, the letter does not demand payment, explicitly or implicitly. The letter does not state the amount of debt, or ask for payment, or threaten consequences for failure to pay, or otherwise contemplate payment. *See* 9/11/20 Letter (Dckt. No. 23, at 19 of 20). In fact, the letter includes only a few scattered references to the loan at all. The subject line includes the loan number, and the body of the letter identifies the sender as the loan servicer. *Id.* ("For informational purposes, Specialized Loan Servicing LLC is the third party mortgage loan servicer who services the mortgage loan secured by this property."). That's it.

The Ostojichs argue that the letter implicitly demanded payment because of the inclusion of the mini-*Miranda* warning and the boilerplate bankruptcy disclaimer. *See* Pls.' Resp., at 6–8 (Dckt. No. 31). But standard disclaimers do "not automatically trigger the protections of the FDCPA, just as the absence of such language does not have dispositive significance." *See Gburek*, 614 F.3d at 386 n.3.

And viewed objectively, as the Seventh Circuit requires, neither disclaimer implicitly demands payment. The mini-*Miranda* warning merely advised the recipient that the communication was from a debt collector, but it did not demand payment or request anything. *See* 9/11/20 Letter (Dckt. No. 23, at 19 of 20) ("[SLS] IS REQUIRED BY FEDERAL LAW TO ADVISE YOU THAT THIS COMMUNICATION IS FROM A DEBT COLLECTOR.").

The content of the letter was much different than the content of the letter in the case offered by Plaintiffs. *See Green v. Specialized Loan Servicing, LLC*, 2016 WL 3963255, at *1 (W.D. Wis. 2016). *Green* involved a notice stating that "[t]his communication is from a debt

collector," that "[t]his is an attempt to collect a debt and any information obtained will be used for that purpose." *Id.* No comparable language appeared in the letter at issue here.

Similarly, the bankruptcy disclaimer does not demand anything. The bankruptcy disclaimer explicitly states that the letter is not a demand for payment if the customer is in bankruptcy or has received a bankruptcy discharge. But that does not mean that the inverse is true. It does not mean that the letter *is* a demand for payment if the customer *isn't* in bankruptcy.

A standard bankruptcy disclosure, without more, does not objectively demand payment. *See Hamilton v. LoanCare, LLC*, 2019 WL 3973132, at *4 (N.D. Ill. 2019) ("[T]he presence of a bankruptcy disclaimer is not dispositive."); *cf. Parente v. Fay Servicing, LLC.*, 2020 WL 1182714, at *3 (N.D. Ill. 2020) (collecting cases and explaining that a letter can be a communication in connection with the collection of debt despite a bankruptcy disclaimer if the objective purpose and context of the letter as a whole is to collect debt).

As a result, the first factor – whether the letter demanded payment – weighs against a finding that the letter is a communication made in connection with the collection of debt.

The second factor – the relationship between the Ostojichs and SLS – weighs in favor of applying the FDCPA. The second factor considers the "nature of the parties' relationship," and specifically "whether the relationship arose only out of the defaulted debt." *See Schlaf*, 899 F.3d at 467. SLS services the Ostojichs' debt, and only started doing so after they went into default. *See* Am. Cplt., at ¶ 9 (Dckt. No. 23). So, the second factor favors a finding that the letter is a communication in connection with the collection of debt.

Finally, the third factor, "the purpose and context of the communications – viewed objectively," weighs against applying the FDCPA. "[A] communication that is sent in the same setting as a collection notice or made 'to threaten and harass the debtor into settling her debt' or

'to encourage [the debtor] to contact [the creditor] to discuss debt-settlement options' is more likely to be made in connection with debt collection." *See Schlaf*, 899 F.3d at 467; *see also Gburek*, 614 F.3d at 386 (explaining that a privacy notice sent in the same envelope as a collection letter and a threatened and harassing telephone call both constituted communications sent in connection with an attempt to collect debt). But here, viewed objectively, the purpose of the letter was to seek information, not obtain payment.

Recall, the letter began by stating the SLS had "been informed that the owner" of the property "is now deceased" and expressed condolences. *See* 9/11/20 Letter (Dckt. No. 23, at 19 of 20). Then, the letter explained "[f]or informational purposes" who SLS is, and requested a variety of documents related to the owner's death and the executor of the estate. *Id.* Specifically, the letter stated that "[i]t is necessary that the representative of the borrower's estate provides [SLS] appropriate documents related to the estate." *Id.* SLS requested (1) the death certificate, (2) the name of the executor, (3) legal documentation reflecting the executor, and (4) proof of property ownership to SLS's Customer Care Department. *Id.*

The letter is similar to a request for contact information. The debt collector wanted to know who had the authority and the responsibility to pay the debt, and how they could be reached. The letter requested information that would be necessary to collect payment someday. But the letter, in and of itself, did not lay much groundwork for collecting the debt.

If this letter was a collection of debt, the debt collector didn't get very far. If collecting contact information falls within the statute, it is hard to see what communications fall on the other side of the line.

Noticeably the letter did not mention the debt or repaying the debt. The loan was only referenced in explaining who SLS is and the loan number in the subject line. It didn't mention

17

settling the debt or encourage the Ostojichs to reach out about paying the debt. And the letter didn't otherwise accompany a debt collection request. Instead, the letter sought information about the death of a property owner and the executor of the estate. Every indication is that the letter sought information about a death and who was in control of the property implicated in the loan.

The Ostojichs argue that the letter was designed to lay the groundwork for debt collection. According to them, the death of a mortgagor would lead to default and foreclosure under the mortgage agreement. *See* Pls.' Resp., at 12 (Dckt. No. 31). Basically, the Ostojichs argue that the debt collector wanted information for a future attempt to collect. Maybe so. But under current case law, taking a step in the direction of collecting a loan is not enough.

Letters that merely inform debtors of the status of their accounts – without nudging them to pay up – are not communications "in connection with the collection of any debt." *See McCready*, 2007 WL 1224616, at *1; *Bailey*, 154 F.3d at 388–89 (7th Cir. 1998). So this letter is not a communication in connection with collecting a debt, either. It "demand[ed] nothing," implied nothing, and didn't contain any warnings about a failure to pay. *See Bailey*, 154 F.3d at 388. Instead, it merely offered condolences and requested information.

One can imagine a situation in which a letter like the one at hand could be part of a broader effort to collect a debt. For example, imagine if a debtor was blowing off a debt collector, by failing to respond to repeated efforts to start a conversation. And imagine if a debtor wanted to find some way to precipitate a response.

A letter that expresses sympathy for the debtor's death might do the trick (and it might *be* a trick). It just might lead the debtor to respond, at long last. Most people have a natural instinct to confirm that they are, in fact, alive. So, expressing condolences to someone who is very much

alive might spark a response. And from that point, the debt collector could try to get a conversation going about paying the debt.

But under the case law, it is not enough that a letter is part of a broader strategy by the debt collector. The communication itself must attempt to collect the debt, someway somehow. And if it doesn't, it isn't a communication in connection with the collection of a debt. Sparking a conversation, it seems, isn't enough – even if it might get the ball rolling.

And more broadly, one can imagine a world in which any communication from a debt collector and a debtor is a communication in connection with the collection of a debt. After all, apart from collecting debt, they don't have much else to talk about. But that's not where the law is, and this Court must take the law as it finds it.

The letter may have distressed Jasna and John Ostojich, and understandably so. But viewing the letter objectively, the letter is not a communication in connection with the collection of a debt. As a result, the FDCPA does not apply. Since the letter is not a communication in connection with the collection of a debt, the Court does not need to address SLS's other argument that the letter was not false or misleading under 15 U.S.C. § 1692e.

## Conclusion

Defendant's motion to dismiss Count I is hereby granted.

Date: August 1, 2022

                                                  Steven C. Seeger
                                                  United States District Judge